Yeah, it is absolutely wonderful to be back in person. It's been a long time, so it's nice to see everybody live. May it please the court, Devin Burstein on behalf of Ms. Rodriguez. Ms. Weifold is on behalf of Mr. Jaimes. I'll be answering any questions related to my client. She'll be answering any questions related to her client. And I'll be trying to handle the larger legal arguments. Your Honors, this is a case about guilt by association. The evidence certainly established that Ms. Rodriguez was associated with the Contaranos. But as this court has held, quote, gang membership itself cannot establish guilt of a crime. And a general agreement, implicit or explicit to support one another, does not provide substantial proof of the specific agreement required for a conviction of conspiracy. In other words, gang membership, again quoting, gang membership is not enough to show that a person has joined a criminal conspiracy. Now, here, Your Honors, as to Ms. Rodriguez, the evidence did not establish the requisite actual meeting of the minds to accomplish a specific illegal objective. And for that reason, her convictions, as well as Mr. Jaimes' convictions, cannot stand. I'd like to go first, kind of tracking how we did it in our brief, to the evidence on the drug conspiracy count. And I'd like to start with a quote from Juan H. Although the court must draw all reasonable inferences in favor of the prosecution, a reasonable inference is one that is supported by a chain of logic, rather than, as in this case, mere speculation dressed up in the guise of evidence. In all of the intercepted communications here, I'm talking texts, letters, calls, Title III wiretaps, all of it, there is not one single example of Ms. Rodriguez discussing drugs, not even in coded language. There's not one witness who said she specifically did anything involving drugs. Nothing was found during the multiple searches of her home that revealed any connection to drug distribution. No drugs, no paraphernalia, no payo sheets, none of the addition of drug trafficking or drug distribution, nothing. On this fax then, Your Honor, the evidence is simply insufficient. There was no meeting of the minds. And I'm reminded of the quote from Paulson of this court's sister circuit, that to conclude so much on the basis of so little amounts to impermissible speculation. So counsel, let me ask you this. So I take it, you know, your version of the case is that she's basically a cheerleader for a contest around us. That's why she had all the frogs in her house. She's just kind of, you know, a groupie or something like that. But their version is she's more like a Tom Hagen from the Godfather. Like she's this one who actually makes things work. And the jury agreed with them. The jury kind of said, no, you're kind of the hand from Game of Thrones, whatever one you want to call it. She was that role. And they would point to those notes, I would imagine, those notes that she kept writing to some of the head people again. What's your response to those notes? Well, to the, well, so they point to a couple of things, to the letters. Sure. And the letters demonstrate, and it's important to take a step back to the question, because what we had here was a trial that went on and on and on about MS, about, I'm sorry, the Contaranas and Laeme, right? It went on about the Mexican mafia. And sure, you can tar her with that feather. If you yell murder, if you yell kind of Mexican mafia, if you yell Contaranas and all this other stuff long enough, well, you can certainly tar the person in the court with that feather. But that's why we have this court, right? That's why we have a court review to look at the legal sufficiency, to actually parse through and take the emotion out of it. Yes, gangs are scary. The Mexican mafia is scary. And putting them all together in a courtroom, that's scary. And certainly we can understand why a jury would be swayed, but this court is not swayed. This court sits back and takes an objective look, a de novo review of the facts. Yes, it's in the light most favorable to the government. But even those letters, we look at those letters. They say nothing coded or otherwise about drug distribution. We're talking about a specific conspiracy, not just something where you generally support the gang. So let's quote from Lennock. Instead of my words, I'll use this court's words. Knowledge, approval of, or acquiescence in the object or purpose of a conspiracy without an intention and agreement to accomplish a specific illegal objective is not sufficient. Again, Espinoza-Valdez. The government has the obligation to establish not only the opportunity, but also the actual meeting of the minds, mere association and activity with a conspirator does not meet the test. And Your Honor, I mean, I think you, yes, you hit the distinct, kind of our two opposing parts here. And our part is quite simple, right? This is not an especially legally complicated case. This is a case that turns much more on the facts under well-established law. Are we on the side of mere association, knowledge of, approval of, acquiescence, or did the government prove beyond a reasonable doubt, our highest standard under the law, that she had a specific agreement, that is there was a specific meeting of the minds to distribute drugs? There is no way, respectfully, there is no way to look at this record without going through kind of hurdles of stacking of inferences, right? We all know the case law. You can't stack inference on inference on inference until you reach a conclusion completely untethered from the underlying facts. There is no way to find Ms. Rodriguez guilty of drug conspiracy. We're talking about drug conspiracy right now without going through that type of leap, that type of speculative leap, without that type of inferential stacking. Unless the court has... And how inferential is it, I guess, is the question. The evidence at trial didn't put her as sort of a side member. The evidence showed she was integral to the communication network of the operation. She made extensive trips to Pelican Bay, which was pretty far from where she resided. She was carrying messages. She has text messages, communicating with other people about bus and raids. She has seemingly intimate knowledge of all these people and their workings. And so when you add all that up, you have a story to tell too. And it seems like it was presented at trial and the jury had, seems like it went with the governments. And so I don't know if it's a matter of inferences that are illogical. It seems like there's actually quite a bit of evidence here. There's not any evidence related to drug distribution. Even if we take all of that evidence, first of all, this is the problem with really this type of prosecution. It's so broad brush. She went to see people in jail. There's one recorded communication. We have no idea. We know she grows up in this neighborhood. Lots of people go see people in jail. There's no evidence of coded or illegal messages related to drugs or any illegal activity in the letters. That's the point. The government says, your honor, look, there's a million letters going back and forth. Okay, let's look at them. You know, I would challenge the government, point to one thing. I mean, the court can ask the government, what in these letters shows she agreed to distribute drugs? What in those visits shows she agreed to distribute drugs? Right, what in those text messages showed she agreed to distribute drugs? And I'll be frank, the text messages thing, it rubbed me the wrong way. I'll just say it like that. If we look at the text messages, 1827 and ER 130, okay, I put them in the brief, bolded. I'm gonna read them. These are the text messages that the government relies on. How you know he's busted? Who? Jose, is he? That was sent three days after an arrest. That's what the government wants to say is proof beyond a reasonable doubt. Next set. I think your friend's brother, Pad, got raided this morning. Ah man, getting all bad. And Christy Pad got hit the same day your friend got busted. Supposedly she was taken in too. And everyone in the pad, her kids got taken away. I'll call you in a few. I get lunch at 1145. Okay. That was sent a week after the raid. Saying I think your friend's brother's Pad got raided. I'm not even sure. But a week later, I'm reporting this to my friend. Look, I put it in the brief and it is so true in this case. It's the old cliche. To a hammer, everything looks like the nail. In this type of RICO prosecution to the government, everything looks like some type of nefarious drug conspiracy. Peel the layers back. We're asking the court to peel the layers back. There's absolutely no evidence that Ms. Rodriguez engaged in drug trafficking conspiracy. Who did she agree with to distribute drugs? When did that agreement take place? What was the agreement? How did she do it? Who, what, where, why, when, how? There's not one iota. And it's not just a case where this is some reactive case, right? And you'd say, well, you know, they didn't, there wasn't that much time to do investigation. They were investigating for years. Wiretapping. Every tool known to the U.S. government. I think the court can be confident if there were actual evidence she did anything to distribute drugs or help distribute drugs, the government would have amply demonstrated it, right? I mean, there would have been lots of evidence of it or one piece of evidence. Here there is none. That is the very definition of insufficient evidence. If there are no more questions about the drug conspiracy, I can certainly move on to the money laundering or go anywhere the court wants me to go, or I can certainly sit down and give my colleague more time. And you also can reserve for rebuttal.  Thank you, Your Honor. Good morning. Verna, we fought on behalf of Alexis Jaimes. What is the evidence that has sent Mr. Jaimes to prison for almost 17 years? He was a gang member. That's not disputed. And of course, that's not enough. Let's get the bad evidence out of the way. He beat somebody up in a parking lot. Not a nice thing to do, of course. And he pled guilty to assault in state court and got five years for that. But what did that have to do with the charges? He pled guilty to assault for that incident, the incident that you're talking about? Yes, he pled guilty to assault in Superior Court. For that exact same? Exact same. And that was pending, and it's in the probation report. That was pending at the time, these charges, which took priority. But that had nothing to do with extortion. It had nothing to do with money laundering, and it had nothing to do with drug conspiracy. And he wasn't charged with any Vicar counts. It makes him look like a bad person, and clearly, you know, it's not a nice thing to do, beat somebody up when they're, you know, in the parking lot. The guy asked him, why are you peeing on my truck? But moving on, moving on. Counsel, so you don't run out of time, turning to count 41, would you address what you maintain are the required elements under 1956H for a money laundering conspiracy? And then address what was insufficient about the government's case. Well, there has to be, you know, some illegal proceeds, and there has to be an attempt to conceal them. There is no evidence concerning Mr. Jimenez that he had anything to do with money. And all of these text messages or these wiretaps, he's not talking about money at all. For a conspiracy, however, could you have the substantive elements committed by some other member of the conspiracy, and then your client joins in the conspiracy, understands the purpose of the conspiracy, joins in it willfully with intent to accomplish the conspiracy? That's possible, but there has to be evidence that he had some kind of a stake in the enterprise, in the money laundering, or even in the drugs. There's nothing to show that Mr. Jimenez had any idea about any kind of money laundering, any kind of drug dealing. And like the Mendoza case that just came down recently, he had no, there was no evidence he had any stake in the operations of the big guys that were doing all of these money laundering and the drug dealing, nothing. And what element do you maintain was not satisfied by the government? The entire, all of the elements. There's no evidence that he agreed to any kind of money laundering. There's no evidence that he agreed to conceal any, or that they would be concealing funds, or that he had any idea that they had any money, that they got any money from drug dealing, or any other kind of illegal activity, nothing. It's totally insufficient. Let's assume for a moment that we agree with you as to that conviction. Okay. There's also the RICO conspiracy, and one of the things we wanted the parties to brief is that, is this scenario. So assume insufficient evidence of money laundering, and not as you can see, assume sufficient evidence of narcotics, conspiracy to distribute narcotics. What do we do with the RICO conspiracy under Griffin? Okay, well, the one thing that the jury was instructed that there were the three elements, or the three crimes for the RICO conspiracy, which was extortion conspiracy, money laundering conspiracy, and drug conspiracy. But as to the extortion conspiracy, there is some wiretap conversations, or tape conversations between Mr. Jaimez and some of these other individuals regarding what you could arguably say is tax collecting. You could say that. But what's really important is that the jury was instructed that extortion conspiracy was different from money laundering conspiracy and drug conspiracy, both of which do not require overt acts. The jury was specifically instructed that extortion conspiracy requires an overt act, and that the overt act has to take place after the last agreement. So the government did not put on any evidence that anyone was actually taxed, that there was any individual, any other drug dealer, from whom the Contaranas or the Mexican Mafia actually extorted money from, nor was there any evidence that any of these individuals or co-defendants or whatever, co-conspirators, attempted to extort somebody. The only evidence they have is that they talked about it. That's it. Do you want to wrap up? Yes, I have 23 minutes, and I'd like to say... Well, not 23 minutes. I mean, seconds. You're actually over. So it's like when the red light's flashing, it's not like the crosswalk where you have to walk faster. You actually have to stop. Okay, so wrapping up, it's that Mr. Jiménez's conviction should be all of them dismissed for insufficient evidence. Thank you very much, Counsel. Yeah, I should have said that before. When the red light is flashing, that's not go faster. That means stop. Good morning, Your Honors. Chelsea Norell on behalf of the United States. The RICO drug trafficking and money laundering conspiracies should be affirmed because they are supported by sufficient evidence and the jury instructions were not plainly erroneous. Drawing all reasonable inferences in support of the verdicts, as the court must on a sufficiency review, a rational juror could find, one, the existence of these conspiracies, and two, the defendant's connections to those conspiracies, which need only be slight. Now, the defendants don't meaningfully challenge this first part, that the Contreras organization was a violent organization that engaged in drug trafficking, money laundering, and extortion by having drug dealers on the streets sell these drugs, having enforcers collect taxes on these sales, and then funneling this money to the Mexican mafia leader, David Gabaldon, through secretaries. What they challenge is their connections to these conspiracies, and the evidence at trial showed that at least they had a slight connection to each of these conspiracies. First, on drug trafficking, the evidence showed that this was the primary activity of the CRO, and that 90% of the proceeds that went to the Mexican mafia were derived from drug trafficking. Defendant Rodriguez was a lifelong member of the CRO, and she was so loyal to the gang that when her own son stepped out of line, she sent him to the gang meeting to meet physical violence for his violations. She was also the trusted conduit between David Gabaldon and his men on the streets, as evidenced by the prison visit video, the correspondence, and the wire calls. Mr. Burstein says she was a friend of these people, but there's no evidence showing that she touched drugs, that she mentioned drugs in a text message or a letter. Can you respond? Yes, Your Honor. That is an unduly narrow version of what it means to be involved in a drug trafficking conspiracy. She need not touch drugs. She need not even talk about drugs. to be involved in joining a conspiracy, knowing of the object, and intending to further it. And here are the ways in which we know that she joined in that conspiracy and intended to accomplish it. Now, as we know from the evidence that was presented in the briefs, she visited David Gabaldon at prison, and part of the reason why there's only one recorded visit is her visitation rights were revoked right after that meeting, because she engaged in overt and covert conversations with Gabaldon about gang infighting and politicking. After that, she visited Jose Loza 14 times in jail. She made that trip up north 800 miles to visit him, and it was at David Gabaldon's behest. This is a reasonable inference, because she only started visiting him two months after David Gabaldon's request to be cellmates with Jose Loza was rejected, denied by the prison. So as the Mexican mafia expert explained at trial, there was a reasonable inference that at that point, David Gabaldon sent her specifically to go help groom his next shot caller. And this is also borne out in the letters that she wrote where she reported back to Gabaldon that she had visited his friend, that his friend said hello. She even thanked Gabaldon for paying for her expenses to go up north to visit Loza, which was effectively an accounting of how CRO funds were being spent. She also communicated specifically about large drug seizures in this case. The text messages that she sent just three days after the drug seizures at Jose Loza's brother's house and at Christy Arizmendi's house, which yielded more than 400 grams of methamphetamine, she wrote to fellow CR members that they had been busted. Now, the defendants want you to construe this evidence in the light most favorable to them and accept their innocent explanations. But Nevels instructs that on a sufficiency review, the court need not consider equally plausible innocent explanations. And I submit these are not even equally plausible innocent explanations. Taken as a whole in the context of her role in this organization as an active member and a conduit of key members, these are not innocent. And you can tell from the language, because she says they were busted. Now, if this were in any way ambiguous, wouldn't you expect the other person to say, oh, my God, busted for what? They don't have to say that. There is a mutual understanding of exactly what the CRO does, and that is drug trafficking. Let me ask you, Counsel, about Mr. Jaimes and money laundering. I will tell you that's the charge I'm the most concerned about. So if you could kind of walk me through the evidence supporting that, and I will just preface this by saying I've read the opening and the closing, which is what I always review when I review criminal cases. It gives me what you guys at the time said the evidence was. I didn't see really much of anything on money laundering. And then assume for a second that there's not. I don't concede that. Do you still purvey on the Rico conspiracy under Griffin? Yes, Your Honor. I'd be happy to address that. So on money laundering, defendant Jaimes participated in the money laundering conspiracy by collecting extortionate taxes that were then packaged and disguised as innocent funds by being sent by third-party secretaries. So what's his knowledge of collecting money? I'm there. What's the evidence that shows that he knew or agreed to participate in this process where money would be packaged and passed along? As the Mexican mafia member, excuse me, as a Mexican mafia expert explained at trial, paying taxes is effectively an insurance policy, knowing that you will likely eventually end up in prison at some point as a Sereno gang member. If you have an insurance policy, you're going to want a receipt on that. A receipt would be your own money order going to the MA member. And if you don't have that, there has to be a good reason that you can't have it. And the good reason is that it's going to get intercepted by law enforcement. So he must know, knowing that, knowing that you can't send that money directly to the MA member yourself, he must have known that he was turning over those funds to get repackaged and sent up to David Gavaldon. So I understand the theory, but what... This expert was not testifying specifically as to the knowledge of this defendant, correct? That's correct, Your Honor. So what evidence is that... I understand the theory, but what evidence is that Jaimez knew this? He never, ever sent a single money order to Gavaldon himself. And to understand why you collect taxes, which is this insurance policy, you have to know that you're getting protection on the other end. If that's not getting repackaged and sent up in a way that conceals the funds, he wouldn't be able to trust this process. He would say, no, I want to send this money to Gavaldon myself. If he didn't understand this is the way that it worked... Because he knew that if and when he was incarcerated, he would have financial protection, if you will, financial backing. He therefore knew that money was going to Gavaldon? Yeah, he knew that this money was intended for Gavaldon. That's the entire purpose of collecting taxes. That is what every Sereno is tasked with doing. They have to put in work, and putting in work means making money for the MA member that controls their territory. That is an axiomatic tenant of being a Sereno gang member. Now, if he's not sending that money himself, he has to know that it's getting packaged and sent up there in some other way. He doesn't need to know how that's being done. He only needs to know the purpose of the conspiracy. So this argument is based on the structure and organization of the gang? Is that fair? Yes, Your Honor. Okay, is it then based... Are we getting this from the expert? We're getting this in part from the expert, but we're also getting this from the wire calls that evidence the entire conspiracy. There were calls between CR members where they said the whole... I'm paraphrasing, but all we're here to do is make money and sell drugs. And this is Homeboy's money. Homeboy... Right, but he's not on those calls, right? Well, he's not on those calls, but how this works was evidenced by the fact that he got the rundown by Donald Goulet, who was the man that he went to collect taxes with in Riverside. And Goulet had explained in a call with Gaitan that when he went to collect taxes, he said this is on behalf of Spider from CR, who is the Mexican mafia member. So it's a reasonable inference that if Goulet knew that and he was giving the rundown to Alexis Jaimes, that he would also know that they're taxing on behalf of the MA member. Counsel, because this was charged as a conspiracy, could you tell me what it is that you think the government did not have to prove because it was a conspiracy charge versus a substantive charge? Yes, Your Honor. The government had to prove that Defendant Jaimes joined the conspiracy knowing of its purpose and intending to help accomplish it. He did not need to engage in the substantive elements of the conspiracy, or excuse me, of money laundering, nor did anyone have to complete the elements. The criminal act in a conspiracy is the agreement. And by collecting those taxes and knowing that in some way they were getting to David Gavaldon, he participated in the conspiracy. I'd like to shift to Your Honor's second question, that even if the court finds insufficient evidence of Alexis Jaimes' personal participation in the money laundering conspiracy, the RICO conspiracy should be affirmed for several reasons. First, the evidence is clear that he participated in the drug trafficking conspiracy and the extortion conspiracy for many of the reasons that I just discussed. But in addition to that, under the second avenue of upholding the RICO conviction, it should be affirmed because he at minimum agreed and knew that other members of the conspiracy, not necessarily himself, were going to engage in drug trafficking and extortion as well as money laundering. We showed this by Alexis Jaimes agreeing that Donald Goulet would collect taxes in Riverside. We know this from the calls where he in fact goes and assists him. He drives 20 minutes to Goulet and gets the rundown on how to collect taxes in this new area. That showed his knowledge and agreement that at least Goulet would be collecting taxes. He also conspired with Ricky Perez to smuggle drugs into prison. He congratulated Ricky Perez on his successful smuggling of drugs into prison and in fact conspired to smuggle more drugs into prison by way of a happy card, which is a card dipped in drugs that can be sold at a markup in prison. And as a tax collector who never personally sent taxes to David Gavaldon, he knew and agreed that those taxes would be funneled by other means, by other members. So that is a secondary reason on which to confirm the RICO conspiracy conviction, even if your honors do not find sufficient evidence for the predicates that the jury found with respect to the money laundering and drug trafficking. So your view is that the Griffin case would apply to a RICO conspiracy much like any other conspiracy? Yes, absolutely. The trilogy of Griffin, Choi, and Gonzalez make clear that the challenges here are factual, not legal insufficiency arguments. So if there is sufficient facts for any two of the three RICO predicates, the conviction should be confirmed. And I was curious, do you know of any published decisions that apply Griffin to a RICO situation? I'm not aware of. We couldn't find any either. I couldn't find any, but the same tenets would apply, because these are factual questions, and the underpinning of Griffin is when you have a factual issue, we trust the fact finder to be able to ferret out what is sufficient evidence and what is insufficient evidence. Where you hit a problem is with a legal insufficiency, because the jury can't be expected to know why something would be legally insufficient, because it may be a statute of limitations issue or an incorrect jury instruction. But that is not the situation here. Defendants do not and cannot challenge any of the elements of the underlying predicate acts that underpin RICO. So it should be confirmed if any two of these acts are supported by the evidence. Can you address this issue that came up in the... I guess it was the first round of supplemental briefing on the money laundering jury instructions and whether that was plain error? Yes, Your Honor. If the court is inclined to consider this waived argument, it must be reviewed for plain error. And first, this court has repeatedly explained that the instructional error in Stein was a result of the defendant being charged both with money laundering and the underlying acts that generated the illegal funds. And that's just not the case here. Neither of the defendants were charged with substantive... I see that my time has expired. Oh, you've got five minutes. Oh, five minutes. That's the yellow light. You can keep going. Thank you, Your Honor. Neither was charged with the illegal acts that actually produced the funds. So this is not a Stein situation, first of all. Second of all, even if Stein applied in this context, that was a substantive money laundering case. And here we have a conspiracy. The elements are different. And this is borne out, much like Your Honor was mentioning, in the elements of a money laundering conspiracy. Those are different than substantive money laundering. And in that, this is made very clear because there was a money laundering conspiracy and substantive money laundering. They first looked at the money laundering conspiracy instructions and said, these are fine. It says they have to know the object of the conspiracy and agree to help accomplish it. They didn't even get into Stein. They only even talked about Stein when they were talking about the substantive money laundering count, which suggests that the knowingly instruction does not vitiate any of the requirements of money laundering conspiracy. But even if Stein applied in a money laundering conspiracy, the definition of knowingly here was not clear or obvious error because we had the saving instruction on specific knowledge with respect to money laundering, namely that the defendant had to know that the proceeds that they were laundering were criminal. And that instruction was given here, too. So under Knapp and then later in Fujinaga, where this court said just giving that secondary instruction was sufficient to overcome any confusion with the general knowledge requirement, it was not plain error to give a general knowledge instruction where you have a specific knowledge instruction with respect to money laundering. Does that answer your honors question? It does. Thank you. Can we go back just a second on the money laundering conviction for Mr. Jaime before you sit down? So you mentioned the expert testimony. Is there any other parts of the record you would direct us to as we review that conviction besides that testimony that sort of gets us for? We know there was money laundering. The question is did he agree to it, and what else would you point to besides that expert? So I would reiterate his role in that conspiracy, which was to collect the money that was then getting funneled through money laundering to David Gavaldon. I'm not sure how much the role helps because his role seems to be sort of at the beginning of the process and not at the end. So I'm not sure what his role tells us about what he therefore knew about where the money was going later. Well, he knew that it was going to Gavaldon because he got the rundown from Donald Goulet about what they were doing in Riverside, that they were taxing on behalf of Spider from CR. And everyone in the Contoranis organization knows that Spider is David Gavaldon. So he knows that the purpose of his taxation is to make money for the gang and to get some of those proceeds up to David Gavaldon. The case law is clear that he need not know exactly how it's getting there, and he need not be involved in the financial transaction to participate in the conspiracy. If the court does not have any other questions, I will submit. Thank you. Like I always say, there's no extra credit for using all of your time. I'm not saying don't, Mr. Bernstein. You can use all of your time, but there's no bonus points if you do. Your Honor, I was contemplating not coming back up, but then Judge Bress asked the question about the plain error on the money laundering. So I did want to make three quick points about the drugs, and then I'll go strictly directly to your question. Number one, the government keeps talking about the slight connection language. And as I was preparing, I saw in Garcia, the late great, I believe it's Judge Reinhart, addressed that. And he said, quote, The connection must nonetheless be proven beyond a reasonable doubt. It's the conspiracy. Proof beyond a reasonable doubt. Slight connection does not mean slight evidence. That's not a conflation that's supported by the law. Number two, the government consistently talks about my client going to visit Loza at the behest of Gabaldon. That is just made up. It's a figment of prosecutorial imagination. There is not one iota of evidence suggesting that is the reason. The third point, again, we hear about these text messages. I read them aloud. I put them verbatim in the briefs. This is what I'll say. If those text messages are proof beyond a reasonable doubt that my client participated in a drug conspiracy, then that sacred standard is a paper tiger. Addressing the Count 41, the plain error instruction, the plain error on the jury instruction, on the general knowledge instruction 4.8, I want to be clear. This case is exactly like Stein with the exception that it's a conspiracy. In Stein, as my colleague just said, the person was charged with the money laundering and the underlying count. Here, Count 41, the money laundering conspiracy, lists as the underlying count includes conspiracy to commit drug distribution. So it's the exact same. She says it's not, but clearly it is. Just look at the indictment in Count 41. Count 41 says money laundering conspiracy and then lists the underlying generating of the funds as drug conspiracy. That's the exact same thing. Look at also how the government charges money laundering conspiracy. They had to prove Ms. Rodriguez agreed with others, quote, to knowingly and intentionally conduct financial transactions, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity. She had that part of the element of the money laundering conspiracy. She had to know that. That is exactly the problem that Stein identified. Even if you're right, what about the prejudice? Because the government argues there's no showing here that this would have affected her substantial rights. Well, yeah, I understand that idea, but I don't think it's borne out by the record because the jury is told that she does not. So if we follow my argument all the way through and we follow the Stein case, what the Stein case says is that by applying the, quote, by applying the later general instruction, a jury could convict Stein in that case without finding that he knew his predicate acts of fraud were unlawful. That's the same situation here. The government lists a number of ways in which the money laundering conspiracy could be fulfilled. Some of them were any type of – the drug distribution is one, but they list a number of them. So by giving – and I know this gets convoluted. I'm trying my best to simplify it, but by giving the general knowledge instruction, it tells the jury that Ms. Rodriguez doesn't need to know the source of the funds are illegal. That's the premise of why Stein found it error. So take that premise and apply it to Ms. Rodriguez. If the jury follows that instruction and believes it does not need to find beyond a reasonable doubt that she knew the funds were unlawful, then what are we left with? We're left with two money orders. Cal 41 lists hundreds of overt acts. Ms. Rodriguez is mentioned in two, sending a $60 money order and a $100 money order. If the jury is told she doesn't need to know the source of those funds are illegal, what are we left with? That's why there's prejudice. If she doesn't have to know that, the jury can convict her of just that simple act without the requisite knowledge that the government charged in the indictment and that the case law says is required. That's the prejudice. I hope I've done a decent job. I guess. Thank you. And I'm not going to use all my time. Because you're over. Thank you very much. Thank you to everyone for your flexibility in moving the case forward to the first one today. Fine briefs, fine argument. Thank you. Thank you very much. This matter is submitted. We'll call the next case.
judges: OWENS, BRESS, Fitzwater